# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 23-0055V

|  |  |
|---|---|
| HEATH CURRENT,<br><br>              Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>              Respondent. | Chief Special Master Corcoran<br><br>Filed: February 6, 2026 |

*Amy A. Senerth, Muller Brazil, LLP, Dresher, PA, for Petitioner.*

*Kimberly Shubert Davey, U.S. Department of Justice, Washington, DC, for Respondent.*

### <u>RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES</u>[1]

On January 17, 2023, Heath Current filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine received on November

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

2, 2021. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

The parties were unable to settle the claim, and have now fully briefed entitlement and damages (ECF Nos. 35, 43, 44, 45). For the reasons set forth herein, I find that Petitioner's shoulder pain likely began within 48 hours of vaccination, and that he is entitled to compensation otherwise. For damages, I award $40,000.00 for actual pain and suffering, plus $774.12 for past unreimbursable expenses.

## I.     Factual Evidence

### A.  Medical Records

Petitioner received a flu vaccine in his left deltoid on November 2, 2021. Ex. 1 at 3. The following month (December 1, 2021), he saw his primary care physician ("PCP") for a routine annual examination. Ex. 2 at 91. The record of this visit notes that Petitioner's legs, back, and feet had been "particularly achy" recently. *Id*. On examination, Petitioner was noted to have "full ROM [range of motion] all extremities," with no joint swelling. *Id*. at 93. The record does not mention Petitioner's arm or shoulder.

Two months after vaccination (January 10, 2022), Petitioner sent a message to his PCP about his left arm. Ex. 2 at 86. Petitioner stated that his "left arm and shoulder is still in pain from the flu shot I got in November . . . . At my appointment last month you said to let you know if it wasn't getting any better and you would send me to physical therapy." *Id*. Petitioner stated that his shoulder pain was now worse, and requested a referral for physical therapy ("PT"). *Id*.

Three days later (January 13, 2022), Petitioner underwent a PT evaluation of his left shoulder. Ex. 2 at 83. The PT record lists a date of injury of October 1, 2021, adding that the mechanism of injury was "pain began after receiving the flu vaccine." *Id*. Petitioner explained that "a couple of months ago" he received a vaccine in his left arm, and it was administered higher than usual. *Id*. He felt "instant pain at that time and it has persisted." *Id*. He rated his pain five out of ten during the appointment, ranging from one at best to eight at worst. *Id*.

Petitioner scored 45 out of 100 on a "functional status" measure, on which the PT record states a higher number indicates greater function. *Id*. at 81. He had difficulty reaching behind his back, pulling up blankets, and lifting even one or two pounds away from his body. *Id*. at 83. On examination, his left shoulder active and passive range of motion ("ROM") were reduced. *Id*. His active ROM was 85 degrees in flexion and 73 degrees in abduction, while his passive ROM was 147 degrees in flexion. *Id*. He had positive results on the Neers, Hawkins, Empty Can, and O'Brien's tests. *Id*. at 84. A treatment plan of two sessions a week for eight weeks was established. *Id*.

Petitioner continued PT for two months. By early February 2022, he had full passive ROM in flexion, his active ROM had improved, his functional status had improved to 62 out of 100, and his pain had improved to four out of ten. Ex. 2 at 62, 64, 66. Petitioner was discharged from PT on March 11, 2022. *Id*. at 49. When he was discharged, he rated his pain one out of ten, had normal ROM in both shoulders, and his functional status had improved to 74 out of 100. *Id*. at 48, 49. He was instructed to continue his exercises at home for at least two to four weeks. *Id*. at 49.

Less than a month later, Petitioner returned to his PCP for a chronic illness follow-up. Ex. 2 at 40. Petitioner reported that he had completed PT a few weeks earlier, and some of his shoulder pain and arm weakness was now returning. *Id*. On examination, his left shoulder ROM was limited. *Id*. at 42. Petitioner's PCP assessed him with nontraumatic incomplete tear of left rotator cuff and left arm weakness, and suspected Petitioner's symptoms were attributable to a degenerative rotator cuff tear. *Id*. They discussed PT or an MRI, and Petitioner chose to continue PT. *Id*.

Petitioner underwent a PT evaluation of his left shoulder on April 15, 2022. Ex. 2 at 37. His functional status had decreased to 67 out of 100, and his pain was now two out of ten, ranging from zero at best to five at worst, though his left shoulder ROM remained normal. *Id*. at 35, 37. Petitioner continued PT for a month. At his last appointment on May 13, 2022, he was pain-free at the time of the appointment, although he reported that his shoulder had been sore for most of the week. *Id*. at 27. He reported feeling his shoulder was now at 95% of normal function, and he felt pain only with certain arm movements when sleeping. *Id*.

## B.  Testimonial Evidence

Petitioner submitted a declaration in support of his claim.[3] Ex. 8. He states that he felt "significant pain" in his left upper arm and shoulder immediately after vaccination. *Id*. at ¶ 3. As the days went on, he started experiencing limited ROM and increased pain. *Id*. Petitioner states that at his annual examination on December 1, 2021, he *did* tell his PCP about his shoulder pain, and was told to send the doctor a message through the portal if it did not improve, and the doctor would order PT. *Id*. at ¶ 4.

Petitioner states that before vaccination, he drove for Uber intermittently to help with household bills. Ex. 8 at ¶ 5. After his injury, he was no longer able to do so; reaching to close a door, or even driving and turning the steering wheel, resulted in pain. *Id*. His injury made showering a challenge, and he could no longer lift his young grandchildren due to pain. *Id*. at ¶¶ 6, 7. His injury limited his ability to help with household chores including carrying groceries, yard work, cleaning the house, and shoveling snow. *Id*. at

---

[3] Although Petitioner labeled Exhibit 8 as an affidavit, it is not notarized. Nonetheless, it is acceptable as a declaration sworn under penalty of perjury. 28 U.S.C. § 1746.

¶ 8. Even two years later (when he signed his declaration on November 20, 2024), his shoulder is not completely back to normal; when playing cards with family, he can no longer shuffle the deck. *Id*. at ¶ 11.

Petitioner states that his injury limited how he could sleep, and he awoke many times at night due to pain. Ex. 8 at ¶ 9. On days he went to PT sessions, his pain worsened. *Id*. at ¶ 10. PT improved his ROM, but he states it is still not the same as it was before vaccination. *Id*. Petitioner adds that he could not receive a steroid injection due to an allergy, and could not undergo an MRI due to titanium in his back from a prior surgery. *Id*.

## II.    Factual Findings and Ruling on Entitlement

### A.  Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[4] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they "suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine . . . ." Section 11(c)(1)(D).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs.*, No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen-month gap); *Silvestri v. Sec'y of Health & Human Servs.*, No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five-month mark).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests
> as shoulder pain and limited range of motion occurring after the

---

[4] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

### B. Parties' Arguments on Entitlement

Petitioner asserts that the record demonstrates that he suffered shoulder pain within 48 hours of vaccination. Petitioner's Motion for Ruling on the Record, filed Nov. 23, 2024, at *7 (ECF No. 35) ("Mot."). When seeking care, he consistently attributed his shoulder pain to vaccination. Mot. at *7. Although the record of his annual physical examination does not so reflect, Petitioner states that he *did* tell his PCP about his shoulder pain at that time. *Id*. at *8. And when he messaged his PCP in January 2022, he referenced the fact that he had mentioned the pain at his appointment the previous month.

*Id*.

Respondent asserts that the record does not preponderantly establish that Petitioner's shoulder pain began within 48 hours. Respondent's Response, filed Jan. 28, 2025, at *6 (ECF No. 44) ("Resp."). Respondent emphasizes that Petitioner did not report shoulder pain until over 60 days after vaccination, and in the interim not only saw his PCP without mentioning shoulder pain, but complained of pain in *other* parts of his body. Resp. at *6. Furthermore, at this examination Petitioner was noted to have full ROM in all extremities, which Respondent views as inconsistent with Petitioner's claim that his shoulder pain existed at that time. *Id*.

Petitioner replies that the Vaccine Act specifically states that a special master may find onset within the time stated in the Table even if it was not recorded or was incorrectly recorded. Petitioner's Reply, filed Feb. 12, 2025, at *2 (ECF No. 45) ("Reply"). Petitioner emphasizes that when he messaged his PCP, he reported shoulder pain that had persisted *since* vaccination. At his PT evaluation several days later, he described his pain as stemming from the vaccine. Reply at *2. Petitioner adds that the absence of a documented shoulder complaint in the December 1, 2021 record does not preclude a finding that Petitioner's shoulder pain began within 48 hours of vaccination, citing *Kirby*, 997 F.3d at 1383. *Id*. at *2-3.

### C. Factual Findings on Onset

The record supports a finding that Petitioner's shoulder pain likely began within 48 hours of vaccination. Petitioner sought care just over two months post-vaccination, reporting his condition to his PCP and requesting a PT referral. When seeking care, he consistently related his pain to vaccination, stating that his shoulder was "still in pain" from vaccination (Ex. 2 at 86), and that he felt "instant pain" at the time of vaccination. *Id*. at 83.

I acknowledge that Petitioner saw his PCP for a physical examination a month after vaccination, and that record not only does not document shoulder pain but states he had full ROM in all extremities. However, the record as a whole, including Petitioner's message to his PCP a month later stating that he was following up on their discussion at the December appointment, supports a finding that Petitioner's shoulder pain likely began within 48 hours of vaccination.

I note that Petitioner reported that other parts of his body were "particularly achy," but apparently registered milder complaints about his shoulder, suggesting that his shoulder pain was less concerning at that time. Additionally, his full ROM at that time suggests that he had not yet developed limited ROM.[5] Thus, the silence of the December

---

[5] There is no requirement that limited ROM manifest within a specific period of time. *Rodgers v. Sec'y of Health & Human Servs*., No. 18-0559V, 2021 WL 4772097, at *8 (Fed. Cl. Spec. Mstr. Sept. 9, 2021)

record on shoulder symptoms suggests that his shoulder pain was manageable at that time and worsened thereafter. This bears on damages but it does not defeat the claim.

### D. Factual Findings on Remaining SIRVA QAI Criteria and Statutory Requirements

The remaining QAI and statutory requirements are not disputed, and I find that they are satisfied. The record does not contain preponderant evidence that Petitioner had a history of left shoulder pain or any other condition that would explain his post-vaccination symptoms. Ex. 2. He exhibited reduced ROM, and his pain and ROM limitations were limited to the vaccinated shoulder. Ex. 2 at 48-83. He received a covered vaccine in the United States. Ex. 1 at 3. He experienced residual effects of his injury for more than six months. Ex. 2 at 37. And he states that he has never received an award or settlement for his vaccine injuries, nor has he filed a civil action. Ex. 4.

Petitioner has established by preponderant evidence that all Table SIRVA and QAI requirements are established. Further, he has established all statutory requirements for entitlement. Thus, Petitioner is entitled to compensation.

## III.    Damages

### A. Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section II of *Matthews v. Sec'y of Health & Human Servs*., No. 22-1396V, 2025 WL 2606607 (Fed. Cl. Spec. Mstr. Aug. 13, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[6]

---

(stating that the Table requires that pain, but not limited ROM, occur within 48 hours of vaccination, noting that reductions in ROM "often lag after the initial injury by weeks or months").

[6] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

### B. Parties' Damages Arguments

Petitioner seeks a pain and suffering award of $60,000.00, relying on *Russo*, *Johnson*, and *Dagen*, in which the claimants were awarded $63,000.00, $65,000.00, and $65,000.00, respectively.[7] Petitioner asserts that his injury resulted in "significant functional limitations, ongoing pain, and a substantial impact on his quality of life." Mot. at *10. When he began PT, he reported significant challenges with basic tasks such as reaching, lifting objects, and sleeping, as well as general activities such as turning a steering wheel and household chores. *Id*. at *11. He improved with PT, but less than a month after stopping PT his pain and weakness returned, resulting in a second round of PT. *Id*. His injury caused pain and limitations for over seven months. *Id*. at *12. By May 2022, he reported a 95% recovery, but was still not back to his pre-vaccination state. *Id*.

Respondent proposes a pain and suffering award of no more than $17,500.00, relying on *Turnquest*, in which the Petitioner was awarded $30,000.00.[8] Resp. at *10-15. Respondent asserts that Petitioner's injury was mild and limited, and he experienced a swift recovery. Resp. at *11. By early February 2022, he had full passive ROM and improved active ROM. *Id*. And later that month, his pain had improved to two out of ten. *Id*. His last treatment occurred just over six months after vaccination, at which time he described his pain as zero out of ten and reported 95% of normal function in his shoulder. *Id*. at *11-12.

Respondent argues that the cases Petitioner relies on are distinguishable, involving petitioners who sought treatment much sooner than Petitioner, ranging from two to sixteen days after vaccination. Resp. at *12-14. And all treated with medications and imaging, while Petitioner underwent no imaging and treated only with PT. *Id*. The petitioners in *Johnson* and *Dagen* also received cortisone injections. *Id*. And the *Johnson* petitioner's pain continued for years. *Id*.

Respondent views Mr. Current's injury as more similar to that of the *Turnquest* petitioner, given that both delayed seeking care for their injuries. Resp. at *14-15. The *Turnquest* petitioner delayed care due to the COVID-19 Pandemic, which Respondent asserts is not a relevant factor in this case. *Id*. And the *Turnquest* petitioner's pain and deficits continued a year after vaccination, and that petitioner underwent imaging and took over-the-counter pain medication, in contrast to Mr. Current, who did not undergo imaging, take medication, or even consult an orthopedist. *Id*. Therefore, Respondent argues that a lower award than *Turnquest* is warranted. *Id*.

---

[7] *Russo v. Sec'y of Health & Human Servs.*, No. 20-1491V, 2022 WL 4717927 (Fed. Cl. Spec. Mstr. Aug. 31, 2022); *Johnson v. Sec'y of Health & Human Servs.*, No. 18-1486V, 2021 WL 836891 (Fed. Cl. Spec. Mstr. Jan. 25, 2021); *Dagen v. Sec'y of Health & Human Servs.*, No. 18-0442V, 2019 WL 7187335 (Fed. Cl. Spec. Mstr. Nov. 6, 2019).

[8] *Turnquest v. Sec'y of Health & Human Servs.*, No. 21-0065V, 2024 WL 3665961 (Fed. Cl. Spec. Mstr. July 2, 2024).

Petitioner replies that he reported his pain a month after vaccination, at his December 2021 routine examination, and was told to send a message through the portal if it did not improve – which he did. Reply at *5. And he was medically unable to undergo an MRI or steroid injection, leaving PT as his only viable option. *Id*. Petitioner asserts that Respondent's attempt to distinguish the cases Petitioner cites overemphasizes minor treatment differences while disregarding the key relevant factors: the severity, duration, and impact of Petitioner's injury on daily life. *Id*.

Petitioner asserts that *Russo*, *Johnson*, and *Dagen* involved moderate injuries that did not require surgery or extensive treatment beyond PT, and Petitioner's 17 PT sessions over several months closely aligns with those cases. Reply at *6. Petitioner asserts that *Turnquest* is not comparable because that petitioner attended only three medical visits, did not attend PT at all, and there were significant treatment gaps – in contrast to Mr. Current, who consistently pursued PT over several months. *Id*. Petitioner views *Turnquest* as setting the "floor, not the ceiling" for a non-surgical SIRVA case. *Id*. at *7.

### C. Appropriate Compensation for Pain and Suffering

Petitioner suffered a mild to moderate SIRVA that resolved in just over six months. His first formal treatment occurred two months after vaccination, although I credit his assertion that he reported his injury to his PCP a month before, even if that record does not memorialize this. He treated with two rounds of PT lasting two months and one month each. His treatment options were limited for medical reasons. His pain ratings were generally in the mild to moderate range, and he recovered well with PT. At discharge, he reported no pain and 95% of normal shoulder function.

*Turnquest* is not a good comparable. The *Turnquest* petitioner attended only three medical appointments for his shoulder condition, and did not undergo surgery, PT, or steroid injections. Additionally, that claimant did not seek treatment for his shoulder until over three months after vaccination, longer than Mr. Current.

The cases Petitioner cites are closer in terms of treatment course, but also involve a significant difference: all three petitioners sought treatment significantly sooner - between two days and just over two weeks after vaccination. Although Petitioner's delay in seeking care does not disqualify his claim, it is relevant to damages, in that it suggests a less severe injury. Petitioner's overall injury duration is sufficient to meet the statutory severity requirement, but not by much. He saw his PCP one month after vaccination and had full ROM and no treatment was provided, suggesting that his condition was mild for a meaningful portion of that time.

Taking these factors into consideration, I find that an award of **$40,000.00** for pain and suffering is appropriate in this case.

10

**Conclusion**

For all of the reasons discussed above and based on consideration of the record as a whole, **I GRANT Petitioner's motion for a ruling on the record, and find that Petitioner suffered an injury that meets the definition for a Table SIRVA and is entitled to compensation. I find that $40,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering**.[9] Additionally, I find that Petitioner is entitled to **$774.12 in unreimbursable expenses**.[10]

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum of $40,774.12, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of Court is directed to enter judgment in accordance with this Decision.[11]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[9] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[10] The parties agree that this sum is reimbursable. Petitioner's Status Report, ECF No. 43 at *1; Resp. at *16.

[11] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.